1  Christina A. Rea, California Bar No. 269107
   christina.rea@bryancave.com
2  Elana D. Cuzzo, California Bar No. 276042
   elana.cuzzo@bryancave.com
3  **BRYAN CAVE LLP**
4  120 Broadway, Suite 300
   Santa Monica, California  90401
5  Telephone:  (310) 576-2100
   Facsimile:   (310) 576-2200
6
7  Attorneys for Defendant
   CITIMORTGAGE, INC.
8

9              **UNITED STATES DISTRICT COURT**

10   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  VICTOR LONDON, an individual on        Case No. CV14-452 GW (MRWx)
13  behalf of LONDON VR LLC; RITA          Hon. George Wu
    LONDON, an individual on behalf of
14  LONDON VR LLC,                         **DEFENDANT'S RESPONSE TO OSC
                                           RE: AMOUNT IN CONTROVERSY
15         Plaintiffs,                     BASED UPON DIVERSITY OF
                                           CITIZENSHIP**
16         vs.
                                           Complaint Filed:   Dec. 13, 2013
17  CITIMORTGAGE, INC.; and DOES 1         Trial Date:         Not Assigned
18  through 50, inclusive,

19         Defendants

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

I.    **INTRODUCTION**

On December 13, 2013, plaintiffs Victor and Rita London, on behalf of London VR, LLC ("Plaintiffs") filed this action in Los Angeles Superior Court, Case Number LC101135 against defendant CitiMortgage, Inc. ("Defendant").  On January 21, 2014, Defendant removed the action to this Court based on diversity jurisdiction. (Docket No. 1.)  The notice of removal alleged facts regarding Plaintiffs' citizenship, as well as the citizenship of Defendant.  The notice of removal also alleged the amount in controversy for jurisdictional purposes exceeds $75,000.  On March 11, 2014, the Court issued an Order to Show Cause regarding jurisdiction.

II.   **THIS COURT HAS DIVERSITY JURISDICTION OVER THIS ACTION**

This Court has original jurisdiction over this action under 28 U.S.C. § 1332. Diversity of citizenship may be dispensed with quickly.  Complete diversity of citizenship exists between the parties in accordance with 28 U.S.C. § 1332, subdivision (a)(1), because Plaintiffs and Defendant are citizens of different states. Plaintiffs are citizens of California. (Compl., ¶ 1.)  Defendant CitiMortgage, Inc. is a New York corporation with its principal place of business in O'Fallon, Missouri.[1]

The amount in controversy also exceeds $75,000, exclusive of interest and costs.  When no amount is specified in the complaint, the removing party has the burden of showing by a preponderance of the evidence, or that it is "more likely than not" that at least $75,000 is in controversy.  *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996); *Guglielmino v. McKee Foods Corp.*, 506

---

[1] Plaintiffs also named entities under fictitious names as defendants (the "Doe Defendants"). (Ex. A, Compl.)  The citizenship of such defendants sued under fictitious names must be disregarded for diversity purposes. 28 U.S.C. § 1441(a) ("citizenship of defendants sued under fictitious names shall be disregarded.").

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1   F.3d 696, 699 (9th Cir. 2007).  This is not a "daunting" burden and "a removing

2   defendant is not obligated to research, state, and prove the plaintiff's claims for

3   damages." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D.

4   Cal. 2008).  "The ultimate inquiry is what amount is put 'in controversy' by the

5   plaintiff's complaint, not what a defendant will actually owe." *Id.* at 1205.

6   "Amount in controversy is determined as of the date of removal, and may include

7   claims for general and special damages, any available attorneys fees, injunctive

8   relief and punitive damages if recoverable as a matter of law." *O'Brien v. Cont'l*

9   *Cas. Co.*, 5:13-CV-01289 EJD, 2013 WL 4396761, *2 (N.D. Cal. Aug. 13, 2013).

10       While the Complaint does not contain a specific damage figure, Plaintiffs'

11   factual contentions show that the amount in controversy is more likely than not in

12   excess of $75,000.  Plaintiffs seek, among other things, (1) general and special

13   damages, (2) punitive damages, (3) attorneys' fees and (4) statutory penalties.

14   (Compl. ¶ 67,  prayer at p. 10.)  Here, the amount in controversy is satisfied for the

15   following reasons.

16       **A.     The Increase in Past Due Loan Balance Demonstrates that the**

17       **Amount in Controversy Is Satisfied.**

18       In its March 11, 2014 Order, the Court stated that the amount in controversy

19   could be demonstrated by showing "the amount by which the balance on the loan

20   supposedly grew during the delays challenged by Plaintiffs in the instant lawsuit."

21   Doc. No. 18 at p. 3 n.3.  This is so because Plaintiffs allege that Defendant

22   purportedly caused the "past-due balance" on the loan to increase beginning in

23   October 2011 when Defendants agreed to review Plaintiffs' loan for modification.

24   (Compl. ¶¶ 11-20.)  In order to value the damages for these claims, Defendant

25   investigated the amount that the loan balance grew during the purported delays

26   resulting from the loan modification review, from the time that Plaintiffs allegedly

27   applied for a loan modification in October 2011 through the date of removal and

28   then to the present.  The results of this investigation are set forth in the declaration

BRYN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1  attached hereto as Exhibit B. Specifically, in October 2011, the total payoff amount
2  of the Loan was $467,317.74. Ex. B. ¶ 12. On the date of removal, January 21,
3  2014, the total payoff amount had grown to approximately $550,622.99. *Id.* ¶ 14.
4  In comparing the two numbers, Plaintiffs' unpaid loan balance had increased to
5  $83,305.25. *Id.* ¶ 15. This by itself demonstrates that the amount in controversy is
6  satisfied.[2]

7  **B.    The Request for Punitive Damages and Emotional Distress**
8  **Demonstrates that the Amount in Controversy Is Satisfied, As**
9  **Evidenced by Similar Jury Verdicts.**

10       Plaintiffs seek punitive damages in this matter. In *Bell*, the Supreme Court
11  commanded district courts to include punitive damages in determining the "amount
12  in controversy: "Where both actual and punitive damages are recoverable under a
13  complaint each *must* be considered to the extent claimed in determining
14  jurisdictional amount." *Bell v. Preferred Life Soc'y.* 320 U.S. 238, 240 (1943)
15  (emphasis added). Ninth Circuit law is in accord, as it must be. "In determining the
16  amount in controversy, the court *must* consider the amount of actual and punitive
17  damages. The court may also consider the amount of attorney's fees, if recoverable.
18  To determine whether subject matter jurisdiction exists, the court can consider
19  extrinsic evidence." *Nasiri v. Allstate Indem. Co.*, 41 Fed. Appx. 76, 77-78 (9th Cir.
20  2002) (emphasis added); *see also Gibson v. Chrysler Corp.*, 261 F.3d 927, 946 (9th
21  Cir. 2001) ("It is well established that punitive damages are part of the amount in
22  controversy in a civil action.").

23       "Additionally, in determining the amount in controversy, the Court may
24  include the request for punitive damages and emotional distress damages if they are

25  ───────────────
26  [2] Similarly, in March 2014, the amount required to pay off Defendant's Loan
    totaled $560,398.75. *Id.* ¶ 15. Comparing that payoff to the October 2011 payoff,
27  Plaintiffs' unpaid loan balance increased by $93,081.01.

28

DEFENDANT'S RESPONSE TO OSC RE:
AMOUNT IN CONTROVERSY

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1  recoverable under the applicable law. ... "To establish emotional distress and

2  punitive damages, defendant may introduce evidence of jury verdicts in cases

3  involving analogous facts." *Perez v. Baxter Healthcare Corp.*, 2012 WL 5373468

4  (C.D. Cal. 2012).  Accordingly, Defendant attaches hereto illustrative jury verdicts.

5  For example, a recent California case based on a defendant's violation of the Fair

6  Debt Collection Practices Act ("FDCPA"), gave rise to a jury verdict of over

7  $340,000.  (Ex. C)  Another recent California case based on both fraud and violation

8  of the FDCPA yielded a jury verdict of over $150,000.  *Id.*  Yet another recent

9  California decision based on the FDCPA in the context of a loan modification

10  awarded plaintiffs $100,000 in actual damages and an additional $400,000 in

11  punitive damages.  *Id.*  All these similar jury verdicts, by themselves, suffice to

12  show that the amount in controversy is "more likely than not" satisfied.

        **C.**      **The Likely Value of Decreased Monthly Payments from the Loan**

                **Modification Establishes that More than $75,000 Is in Controversy.**

15  In its March 11, 2014 Order, the Court cited *Johnson* for the proposition that

16  "if a plaintiff asserts that he is entitled to a wrongfully denied loan modification, the

17  amount put into controversy is the difference between the value of the existing loan

18  and the proposed modified loan." *Johnson v. Wells Fargo Home Mrtg.,* No. CV 12-

19  144-GAF, 2012 WL 1229880, at *3 (C.D. Cal. Apr. 11, 2012).  So the amount in

20  controversy is, at a minimum, the difference between Plaintiffs' current monthly

21  mortgage payments pursuant to Defendant's enforced loan and Plaintiffs' potential

22  monthly payment under a possible loan modification.  "In proving the amount in

23  controversy, defendants may rely on calculations to satisfy their burden so long as

24  their calculations are good faith, reliable estimates based on the pleadings and other

25  evidence in the record." *Ellis v. Pacific Bell Tel. Co.,* 2011 WL 499390, at *2 (C.D.

26  Cal. 2011) (*citing Behrazfar v. Unisys Corp.,* 687 F. Supp. 2d 999, 1004 (C.D. Cal.

27  2009)).  Because Plaintiffs never qualified for a loan modification, Defendant is

28  unable to provide a specific value of what Plaintiffs' proposed modified loan

4

1  payment would have been.  Defendant can, however, provide the following good

2  faith, reliable estimate.

3      Here, Plaintiffs' current monthly mortgage payment is $2,405.  Assuming that

4  Plaintiffs qualified for and had been offered a loan modification with a 30-year loan,

5  Plaintiffs would have likely saved at least a few hundred dollars each month.  Even

6  with a very conservative estimate of saving only $250 per month with a modified

7  monthly payment, each month, over a 30-year loan term, simple math shows that a

8  potential loan modification would have saved Plaintiffs over $75,000.  Under the

9  promissory note, Plaintiffs promised to pay monthly mortgage payments of  $2,450

10  for the first 120 months, and thereafter Plaintiffs' payments would become

11  $3,310.34 for the remainder of the loan (240 months), for a total payment amount of

12  $1,088,481.60.  (See Ex. D, Promissory Note.)  Conservatively assuming that

13  Plaintiffs would have saved $250 per month in mortgage payments through a

14  potential loan modification, Plaintiffs' monthly payment would be $2,200 and,

15  assuming a 30-year loan, Plaintiffs' total payment under the modified loan would be

16  $792,000.  Accordingly, the difference between a potential loan modification and

17  the current loan in effect is $296,481.60, which exceeds the amount in controversy

18  requirement, and does not even include the purported damages relating to Plaintiffs'

19  credit reporting allegations.

20  **D.    The Request for Attorneys' Fees Must Be Considered in Assessing**

21  **the Amount in Controversy.**

22      Any one of the arguments above by itself demonstrates that the amount in

23  controversy is met.  Furthermore, Plaintiffs also seek to recover their attorneys' fees

24  incurred in this matter.  Attorneys' fees must be considered in calculating the

25  amount in controversy.  *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th

26  Cir. 2007); *Galt G/S v JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998)

27  ("[W]here an underlying statute authorizes an award of attorneys' fees, either with

28  mandatory or discretionary language, such fees may be included in the amount in

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

SM01DOCS\1023872.5

5

1 controversy."); *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005) ("The

2 amount in controversy includes the amount of damages in dispute, as well as

3 attorney's fees, if authorized by statute or contract."). To the extent the Court is not

4 satisfied that the arguments above demonstrate that the amount in controversy is

5 satisfied, Defendant requests limited discovery regarding Plaintiffs' attorneys' fees.

6 **IV.   CONCLUSION**

7      The amount in controversy is satisfied because the loan balance grew by more

8 than $75,000 during the time that Plaintiffs were being considered for a loan

9 modification. That fact by itself confers jurisdiction on this Court.

10     What is more, Plaintiffs also seek damages for emotional distress, punitive

11 damages, statutory damages, and attorney's fees. All these damages are further

12 evidence that, "more likely than not," the amount in controversy exceeds $75,000.

13 Jury verdicts in similar cases confirm this point.

14     Further, based on the simple difference between the current loan payment

15 amount and the potential modified loan payment, the amount in controversy is well

16 in excess of $75,000. While Defendant denies the allegations in Plaintiffs'

17 Complaint, for jurisdictional purposes it is clear that the amount in controversy

18 exceeds $75,000, exclusive of interest and costs.

19     For the foregoing reasons, Defendant requests the Court discharge its Order to

20 Show Cause and retain jurisdiction over this action.

21 Dated: March 18, 2014                    Respectfully submitted,

22

23                                          Christina A. Rea
                                            Elana D. Cuzzo
24                                          **BRYAN CAVE LLP**

25

26                                          By:

27                                               Elana D. Cuzzo
                                            Attorneys for Defendant
28                                          CITIMORTGAGE, INC.

DEFENDANT'S RESPONSE TO OSC RE:
AMOUNT IN CONTROVERSY

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BLUEBIRDCowire.com | (880) 477-0700

**EXHIBIT A**

1  CONSUMER ACTION LAW GROUP, PC
   YELENA GUREVICH, SBN 269487
2  lena@calgroup.org
   LAUREN RODE, SBN 281803
3  lauren@calgroup.org
   KENLEY DYGERT, SBN 287573
4  kenley@calgroup.org
   3700 Eagle Rock Blvd.,
5  Los Angeles, CA 90041
   Tel. (818) 254-8413
6  Fax. (866) 936-6916
7
8  Attorneys for Plaintiffs,
   VICTOR LONDON
9  RITA LONDON
   LONDON VR LLC
10

ORIGINAL FILED

DEC 13 2013

LOS ANGELES
SUPERIOR COURT

11
             SUPERIOR COURT FOR THE STATE OF CALIFORNIA
12
             FOR THE COUNTY OF LOS ANGELES
13

14  VICTOR LONDON, an individual on behalf of    )  CASE NO:        LC101135
    LONDON VR LLC; RITA LONDON, an               )
15  individual on behalf of LONDON VR LLC,       )  COMPLAINT FOR:
                                                 )
16              Plaintiffs,                       )    1. **VIOLATION OF BUSINESS AND**
                                                 )       **PROFESSIONS CODE SECTION**
17                                                )       **17200**
                 v.                              )    2. **FRAUD AND CONCEALMENT**
18                                                )    3. **VIOLATION OF THE**
    CITIMORTGAGE, INC; and DOES 1 through        )       **ROSENTHAL FAIR DEBT**
19  50, inclusive,                               )       **COLLECTION PRACTICES ACT:**
                                                 )       **CIVIL CODE SECTION 1812.700(A)**
20              Defendants.                       )    4. **VIOLATION OF THE**
                                                 )       **CALIFORNIA CONSUMER**
21                                                )       **CREDIT REPORTING AGENCIES**
                                                 )       **ACT**
22                                                )    5. **NEGLIGENCE**
                                                 )    6. **PROMISSORY ESTOPPEL**
23                                                )
                                                 )  **DEMAND FOR JURY TRIAL**
24                                                )
                                                 )
25                                                )
26  ───────────────────────────────────────── )
27
28

                                  -1-

                              **COMPLAINT**

COME NOW the Plaintiffs, VICTOR LONDON, an individual on behalf of LONDON VR LLC and RITA LONDON, an individual on behalf of LONDON VR LLC (hereinafter "Plaintiffs") complaining of Defendants CITIMORTGAGE, INC, and DOES 1 through 50, inclusive and each of them, and allege as follows:

# I

## PARTIES

Plaintiffs allege:

1. At all relevant times herein, Plaintiffs were residing in the County of Los Angeles, State of California.

2. Plaintiffs are informed and believe that, at all times relevant to this complaint, Defendant CITIMORTGAGE, INC (hereinafter "CITI"), is and was doing business in the State of California.

3. The true names or capacities, whether individual, corporate, associate or otherwise of Defendants named herein as Does 1 through 50, inclusive, are unknown to Plaintiffs who therefore sues said Defendants by such fictitious names, and Plaintiffs will amend this complaint to show their true names and capacities when the same has been ascertained.

4. At all times relevant herein, each of the Doe Defendants was the agent, servant, representative and/or employee of each of the remaining Defendants and was at all times acting within the course and scope of such agency and/or employment, or was in some way the cause of Plaintiffs' damages.

# II

## FACTS COMMON TO ALL CAUSES OF ACTION

5. Plaintiffs are the legal owners of the real property commonly known as 7259 Hyannis Drive, West Hills, CA 91307.

6. On or about January 16, 2004, Plaintiffs, Victor and Rita London, obtained a loan.  Plaintiffs executed a promissory note and a deed of trust secured to the property in order to secure repayment.

-2-

COMPLAINT

7.  On or about April 5, 2012, Plaintiffs, Victor and Rita London, conveyed the property to London VR LLC.

8.  On or about October 2011, Plaintiffs contacted Citi for the purpose of discussing and applying for a loan modification.

9.  Plaintiffs submitted a loan modification application to Citi on or about October 2011.

10. As part of Plaintiffs' loan modification application, Plaintiffs were required to state the number of properties that they own.

11. Plaintiffs' loan modification application stated that Plaintiffs owned 8 properties.

12. Citi reviewed Plaintiffs' loan modification application for approximately one year and a half.

13. Citi subsequently denied Plaintiffs' loan modification application because Plaintiff owned too many properties.

14. In response to the denial of Plaintiffs' October 2011 loan modification application, Plaintiffs again applied for a loan modification on or about the summer of 2012.

15. Citi again reviewed Plaintiffs' loan modification application for approximately one year.

16. Citi subsequently denied Plaintiffs' loan modification application because Citi could not reduce Plaintiffs' monthly loan payment by 6% or more due to the excessive past due balance on Plaintiffs' loan account.

17. According to Citi, Citi is only permitted to modify a loan if the modification fits within the investor guidelines.

18. According to Citi, the investor guidelines that govern the modification eligibility for Plaintiffs' loan provides: 1) that a loan cannot be modified if the borrower in question owns more than 5 properties, including his/her residence; 2) that Citi cannot modify a loan unless the proposed modification will decrease the applicants' monthly loan payment by 6% or more.

19. The length of the loan modification review was so long that interest rates have increased to the approximate market rate of 4.5%.

20. The length of the loan modification review was so long that it caused Plaintiffs' past due balance to increase.  The fact that the past due balance increased has caused Plaintiffs' loan to fall outside

-3-

**COMPLAINT**

of the investor guidelines on modifications.  Since Plaintiffs' loan fell outside of the investor guidelines, Plaintiffs' loan modification application was denied.

21. Had Plaintiffs known that their loan modification application would have been denied because they owned too many properties; Plaintiffs would not have gone along with the loan modification review process for over a year and a half.  Instead, Plaintiffs would have explored options to sell their property.

22. Citi reports Plaintiffs as delinquent on their credit reports.

23. Plaintiffs' property is presently valued at approximately $665,589 and therefore has equity when compared with the loan balance.

24. Victor has been diagnosed with anxiety due to the stress that Citi has caused throughout the loan modification review process.

### III

### FIRST CAUSE OF ACTION

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

### (Against All Named Defendants and DOES 1 through 50)

25. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

26. Citi's conduct involves their business acts and practices.

27. Citi's conduct is unlawful to the extent that they have violated the law as alleged herein.

28. Citi's conduct is unfair as it relates to the loan modification process.  First, at the time Plaintiffs applied for a loan modification, Plaintiffs disclosed that they owned eight (8) properties.  Second, Citi took over one year and a half to review Plaintiffs' loan modification application.

29. Relating to the unfairness prong, the aforementioned two points have the following effects: first, Citi strung Plaintiffs along for a year and a half while the review was ongoing only for Citi to deny Plaintiffs' application because they owned too many properties, a fact which Citi knew from the very beginning; Citi should have immediately denied Plaintiffs' application for owning too many properties instead of falsely providing hope that Plaintiffs' loan would be modified;

-4-

COMPLAINT

second, the mere fact that the review took one year and a half meant that the past due balance on Plaintiffs' loan increased each month during that year and a half; had Citi timely and properly reviewed Plaintiffs' loan modification application, Plaintiffs would not have been denied for a modification for a reason that is solely attributed to Citi.

30. Citi's conduct is fraudulent because Citi strung Plaintiffs along for a year and a half while the modification review took place; Citi provided Plaintiffs with false hope in that Plaintiffs' loan could and would actually be modified; Citi's failure to timely review the application caused Plaintiffs' loan balance to exceed the modification limits provided by the investor guidelines.

31. Citi intended on stringing Plaintiffs along throughout the modification process in order to cause the past due balance to be so high that Plaintiffs would never be able to pay off the past due balance and never receive a loan modification or some other option to avoid foreclosure. Citi's intended goal was to prevent Plaintiffs from saving their property in order to move forward with foreclosure to make a profit due to the equity on the property.

32. Plaintiffs' injury is not outweighed by any countervailing benefits to consumers or competition because California's public policy promotes loan modifications as well as other options to avoid foreclosure because of the fact that foreclosures have such a dramatic effect on the California economy. Citi is not acting in conformity with California's public policy and they are instead promoting foreclosure.

33. Plaintiffs, nor consumers in general, could not nor cannot prevent their own injury because they were and are at the mercy of their mortgage servicers. Plaintiffs did all they could to prevent their own injury by complying with Citi's process on loan modifications. Plaintiffs could not have forced Citi to engage in an alternative, more beneficial course of conduct.

34. Plaintiffs have suffered economic injury.

///
///
///
///
///

**COMPLAINT**

IV

**SECOND CAUSE OF ACTION**

**FRAUD AND CONCEALMENT**

**(Against All Named Defendants and DOES 1 through 50)**

35. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

36. Citi acts as Plaintiffs' home loan servicer.

37. Citi intentionally failed to disclose an important and material fact to Plaintiffs, namely that Plaintiffs' loan could not and would not be modified because Plaintiffs own eight (8) properties, which is more than the investors permit (i.e., five [5]).

38. Citi disclosed some facts to Plaintiffs but Citi intentionally failed to disclose the investor's limits on property ownership to Plaintiffs, thereby making the disclosure deceptive.

39. Citi intentionally failed to disclose said important facts that were known only to Citi and that Plaintiffs could not have discovered said facts with reasonable diligence.

40. Plaintiffs did not know of the concealed fact.

41. Citi intended to deceive Plaintiffs by concealing the true facts.

42. Plaintiffs reasonably relied on Citi's deception by going along with the loan modification review process for over one year and a half.

43. Plaintiffs have been damaged due to Citi's deception.

44. Citi's deception was the sole and substantial factor in causing Plaintiffs' damages.

///
///
///
///
///
///
///
///

-6-

**COMPLAINT**

## V

### THIRD CAUSE OF ACTION

### VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT:

### CALIFORNIA CIVIL CODE SECTION 1812.700(a)

**(Against All Named Defendants and DOES 1 through 50)**

45. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

46. The Fair Debt Collection Practices Act prohibits a number of unfair and deceptive consumer debt collection practices, including the use of "false, deceptive, or misleading representations in connection with the collection of any debt."

47. Defendant is a known debt collector and is subject to this Act.

48. Defendant's conduct does not relate to the collection of a debt by foreclosing on a deed of trust. Rather, Citi's conduct led to false and misleading representations in regards to the loan modification process that Plaintiffs went through with Citi.

49. Citi deliberately mislead Plaintiffs into believing that their loan could be modified despite informing Citi that Plaintiffs owned eight (8) properties.

50. Had Plaintiffs known that Citi would not modify Plaintiffs' loan under any circumstances due to Plaintiffs' ownership of eight (8) properties, then Plaintiffs would not have spent one year and a half working towards a loan modification and would have instead explored options to sell their property.

///
///
///
///
///
///
///
///

-7-

**COMPLAINT**

## VI

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT

### (Against All Named Defendants and DOES 1 through 50)

51. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

52. By deliberately misleading Plaintiffs into believing that their loan could be modified despite informing Citi that Plaintiffs owned eight (8) properties, Citi has reported Plaintiffs as delinquent to the credit bureau's for a longer period of time than was necessary.

53. Had Plaintiffs known that Citi would not modify Plaintiffs' loan under any circumstances due to Plaintiffs' ownership of eight (8) properties, then Plaintiffs would not have spent one year and a half working towards a loan modification and would have instead explored options to sell their property.  Plaintiffs would have sold their property within a couple months of learning that their loan could not be modified because they owned too many properties.  Citi prolonged the modification process and reported Plaintiffs as delinquent during that time.

54. In committing the false credit reporting and in continuing to falsely credit-report Plaintiffs after notice from them, Citi has violated Cal. Civ. Code Section 1785.25(a).

55. As a consequence of these violations, Plaintiffs have suffered both general and special damages to be awarded according to proof.

///
///
///
///
///
///
///
///

-8-

COMPLAINT

## VII

### FIFTH CAUSE OF ACTION

### NEGLIGENCE

#### (Against All Named Defendants and DOES 1 through 50)

56. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

57. Citi owes Plaintiffs a duty of care by virtue of the fact that Citi failed to disclose to Plaintiffs the fact that Plaintiffs' loan would not be modified because Plaintiffs owned more than five properties. Not once during the modification review process did Citi indicate or otherwise hint at the fact that Plaintiffs would not receive a loan modification for owning more than five properties.

58. Citi breached its duty of care by failing to disclose the aforementioned material facts to Plaintiffs.

59. Citi's conduct is the "but for" cause of Plaintiffs' injuries.

60. Plaintiffs have suffered damages due to Citi's conduct.

## VIII

### SIXTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

#### (Against All Named Defendants and DOES 1 through 50)

61. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though they are fully set forth herein.

62. Citi promised to review Plaintiffs for a loan modification, evidenced by Plaintiffs' submission of a loan modification application and Citi's review of the application for over a year and a half.

63. Citi however, was unable to fully review Plaintiffs' loan modification application because the application was destined to fail from the very beginning since Citi knew that Plaintiffs owned eight properties but the investor's limit is only five.

64. Plaintiffs relied by going through the modification process with Citi for over a year and a half.

-9-

COMPLAINT

65. Plaintiffs' reliance was reasonable and foreseeable because a loan modification is what Plaintiffs needed in order to alleviate their financial strains and escape foreclosure.

66. Plaintiffs have suffered damages due to Citi's conduct.

## IX

## **PRAYER FOR RELIEF**

67. WHEREFORE, Plaintiffs demand judgment as follows:

    a.  For general and special damages according to proof at trial;

    b.  For statutory penalties for each separate statutory violation where allowed by statute;

    c.  For punitive damages against Defendant according to proof at trial and using the applicable punitive damages standards from the involved statutes;

    d.  For injunctive relief;

    e.  For attorney's fees where authorized by statute or law;

    f.  For costs of suit;

    g.  For such other relief as the court deems just and proper

DATED: December 4, 2013           CONSUMER ACTION LAW GROUP, PC

                               By: _____
                                  Yelena Gurevich
                                  Lauren Rode
                                  Kenley Dygert
                                  Attorneys for Plaintiffs,
                                   VICTOR LONDON, an individual on
                                   behalf of LONDON VR LLC
                                   RITA LONDON, an individual on behalf
                                   of LONDON VR LLC

**COMPLAINT**

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):* <br> Yelena Gurevich (269487); Lauren Rode (281803); Kenley Dygert (287573) <br> Consumer Action Law Group, P.C. <br> 3700 Eagle Rock Blvd. <br> Los Angeles, CA 90041 <br> TELEPHONE NO.: 818-254-8413    FAX NO.: 866-936-6916 <br> ATTORNEY FOR *(Name):* PLAINTIFFS | **FOR COURT USE ONLY** <br><br> **ORIGINAL FILED** <br><br> DEC 13 2013 <br><br> **LOS ANGELES** <br> **SUPERIOR COURT** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
  STREET ADDRESS: 6230 Sylmar Ave.
  MAILING ADDRESS:
  CITY AND ZIP CODE: Van Nuys, CA 91401
  BRANCH NAME:

CASE NAME:
  LONDON V. CITIMORTGAGE, INC.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| ☑ **Unlimited** <br> (Amount <br> demanded <br> exceeds $25,000) | ☐ **Limited** <br> (Amount <br> demanded is <br> $25,000 or less) | ☐ Counter  ☐ Joinder <br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | LC101135 <br><br> JUDGE: <br><br> DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☑ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ☑ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.☐ monetary   b.☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):*  SIX (6)
5. This case ☐ is  ☑ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 12/04/2013
KENLEY DYGERT
_____          ►          _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; <br> Cal. Standards of Judicial Administration, std. 3.10 <br> www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

BLUEBIRDonline.com (888) 477-0700

**EXHIBIT  B**



1 | Christina A. Rea, California Bar No. 269107
2 | christina.rea@bryancave.com
Elana D. Cuzzo, California Bar No. 276042
3 | elana.cuzzo@bryancave.com
**BRYAN CAVE LLP**
4 | 120 Broadway, Suite 300
Santa Monica, California  90401
5 | Telephone:  (310) 576-2100
6 | Facsimile:  (310) 576-2200

7 | Attorneys for Defendant
CITIMORTGAGE, INC.
8

9 | **UNITED STATES DISTRICT COURT**
10 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
11

12 | VICTOR LONDON, an individual on
13 | behalf of LONDON VR LLC; RITA
LONDON, an individual on behalf of
14 | LONDON VR LLC,
15 | 		Plaintiffs,
16 | 	vs.
17 | CITIMORTGAGE, INC.; and DOES 1
18 | through 50, inclusive,
19 | 		Defendants.
20

Case No. CV14-452 GW (MRWx)
Hon. George Wu

**DECLARATION OF BARBARA
DAUSTER-ADAMS IN RESPONSE
TO COURT'S ORDER TO SHOW
CAUSE REGARDING AMOUNT IN
CONTROVERSY**

Complaint Filed:   Dec. 13, 2013
Trial Date:          Not Assigned

SM01DOCS\1023886.2

DECLARATION IN RESPONSE TO
ORDER TO SHOW CAUSE RE: AMOUNT IN
CONTROVERSY

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1  including the records described above, which I believe to be true and accurate. If

2  called as a witness, I could and would testify competently under oath to such facts.

3       7.     A true and accurate copy of the promissory note signed by Victor

4  London and Rita C. London (the "Note") was attached as <u>Exhibit B</u> to my

5  declaration in support of removal.

6       8.     Based on my review of the above-described business records, including

7  the note and deed of trust, the loan at issue in this action was in the original principal

8  amount of approximately $444,000.

9       9.     Based on my review of the above-described business records, including

10  the note and deed of trust, the term of the loan is thirty years.

11       10.     Based on my review of the above-described business records, including

12  the note and deed of trust, the initial monthly payment due under the promissory

13  note is $2,405.00. The loan was an interest only loan for the first ten years.

14       11.     Based on my review of the above-described business records, the total

15  principal balance that remains due under the deed of trust and the note is currently

16  $443,983.50.

17       12.     Plaintiffs claim that they first applied for a loan modification in

18  October 2011. In October 2011, the total amount due under the Note (i.e., the total

19  amount to pay off the loan) was approximatley $467,317.74. This amount consisted

20  of $443,983.50 in unpaid principal balance, plus a negative escrow amount of

21  approximately $23,334.24.

22       13.     At the time this case was removed to federal court on January 21, 2014,

23  the total amount due under the Note had grown to approximately $550,622.99. This

24  amount was calculated by adding the following amounts: $443,983.50 in unpaid

25  principal balance, $64,932.57 in deliquency interest, $40,507.92 in negative escrow,

26  $799.00 in delinquency fees, and $400.00 in servicing fees.

27

28

BRYAN CAVE LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

DECLARATION IN RESPONSE TO
ORDER TO SHOW CAUSE RE: AMOUNT IN
CONTROVERSY

1      14.    The difference between the October 2011 payoff amount of

2  approximately $467,317.74 and the January 21, 2014, payoff amount of

3  approximately $550,622.99 is $83,305.25.

4      15.    By March 14, 2014, the amount due under the Note totaled

5  approximately $560,398.75.

6      I declare under penalty of perjury under the laws of the United States that the

7  foregoing is true and correct.

8      Executed this _17th_ day of March, 2014, at ___/2:30pm___, O'Fallon,

9  Missouri.

10

11                                    _Barbara Dauster Adams_

12                                    Barbara Dauster-Adams

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  SM01DOCS\1023886.2

                                3

Bryan Cave LLP
3161 MICHELSON DRIVE, SUITE 1500
Irvine, California 92612-4414

**EXHIBIT C**

# Daily Journal

**Classifieds/Jobs/Office Space : Experts/Services : MCLE : Search : Logout**

| WEDNESDAY | THURSDAY | FRIDAY | MONDAY | TODAY |
| --- | --- | --- | --- | --- |

**VERDICTS & SETTLEMENTS**

Search >>
Bookmark

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click 'Reprint' to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

Rescission          $135,000          For the plaintiff:        Orange Superior
                                      Jon B. Dumbeck          Hon. Eleanor M. Palk
                                      Jason D. Dumbeck
                                      Curtis M. King
                                      Robert Stempler
                                      For the defendant:
                                      Paul A. Brennan
                                      Paula M. Harrelson

**RESULT DATE: 'Sept. ' 17, 2001**

Efren Angel, Teresa Angel v. Villa Honda, YFB Hemet Inc. dba Villa Honda, WFS Financial Inc. (00CC12922) 01-JV_1097

**FURTHER DESCRIPTION:** Fraud

**Verdict:** $135,000

**ATTORNEY** Plaintiff - Jon B. Dumbeck, Jason D. Dumbeck, Curtis M. King (Dumbeck & Dumbeck, Solana Beach); Robert Stempler (Consumer Rights Advocacy Center of Southern California, Palm Desert). Defendant - Paul A. Brennan (Law Offices of Paul A. Brennan, San Juan Capistrano); Paula M. Harrelson (Prenovost, Normandin, Bergh & Dawe, Santa Ana).

**TECHNICAL** Plaintiff - Thomas A. Tarter, lending practices, Encino.

**FACTS:** The plaintiffs, Efren and Teresa Angel, purchased a used Honda Accord from defendant Villa Honda in March 1999. The plaintiffs had a poor credit history due to a prior bankruptcy. Defendant WFS Financial provided financing for the purchase of the Honda. The plaintiffs were unable to pay the entire down payment to Villa Honda in April 1999, as agreed, and did not pay Villa Honda the full down payment until October 1999, after Villa Honda had filed a small claims court action to recover the down payment. In October 1999, the plaintiffs discovered salt damage on the underside of the Honda Accord. The Honda Accord had previously been a leased vehicle in Pennsylvania. The plaintiffs maintained that the salt damage had not been disclosed to them by Honda Accord. Plaintiff Efren Angel returned to Villa Honda on Oct. 29, 1999 and demanded his money back or another car. Villa Honda then sold him a Toyota Camry and listed the Honda Accord as a trade-in on the purchase contract for the Camry. Plaintiff Efren Angel understood the contract to be an even exchange except that the monthly payment would be slightly higher for the Camry. The contract, however, indicated a cash down payment of $1,000. Defendant Villa Honda, however, was unable to find a lender that would purchase the contract for the Toyota. Villa Honda repossessed the Camry on Nov. 18, 1999 and demanded that Efren Angel pay $1,000 to reinstate the contract. Plaintiff Efren Angel refused. Villa Honda did not pay off the plaintiff's loan to WFS Financial Inc. on the Honda. The plaintiffs explained the situation to WFS Financial and requested that WFS not report the account to credit reporting agencies. WFS instead repossessed the Honda and then sold the Honda back to Villa Honda for the full amount of the loan. WFS reported a voluntary repossession and a charge-off on the plaintiff's account to credit reporting agencies and failed to report that the plaintiffs disputed the obligation.

**CONTENTIONS:** The plaintiffs contended that Villa Honda engaged in fraudulent and illegal practices during the transactions for the purchase of the Honda and the Camry. The plaintiffs also maintained that WFS Financial inaccurately reported negative credit information about them to credit reporting agencies. Defendant Villa Honda contended that it treated the plaintiffs fairly and that it lawfully repossessed the Camry after plaintiff Efren Angel refused to pay the $1,000 down payment. It also maintained that the plaintiffs paid the down payment on the Honda with a bad check and failed to live up to their contractual obligations. Defendant WFS Financial alleged that it accurately reported the plaintiff's account information to the credit reporting agencies. It also claimed that because the dispute was between the plaintiffs and Villa Honda, WFS Financial was not required to note the plaintiff's dispute when it reported on the plaintiff's account to the credit reporting agencies.

**SETTLEMENT DISCUSSIONS:** The plaintiffs' first attorney demanded $50,000 from Villa Honda, which was reduced to $10,000 and then $5,000 before a lawsuit was filed. Villa Honda offered nothing. The plaintiffs obtained new counsel and filed a lawsuit. After the lawsuit was filed, defendant WFS Financial offered to clear the plaintiff's credit in exchange for a release. The plaintiffs demanded that WFS Financial clear the plaintiff's credit and pay $20,000. At the mandatory settlement conference, the defendants made a joint offer of $20,000. The plaintiffs, however, demanded $80,000. Shortly before trial, the defendants made a joint offer of $45,000.

**OTHER INFORMATION:** Based on the jury's finding that defendant Villa Honda violated Civil Code Section 2981.9 by using separate promissory notes, which were not disclosed in the purchase contracts, the court will determine whether or not to issue an injunction against Villa Honda prohibiting the use of such promissory notes in the future. The court will also determine whether or not defendant Villa Honda should provide restitution to other consumers in past transactions involving separate promissory notes pursuant to the plaintiff's Business & Professions Code Section 17200 claim. Additionally, based on the jury's finding that defendant WFS Financial Inc. willfully violated the Consumer Credit Reporting Agencies Act on 60 occasions with respect to the plaintiff's account, the court will determine an appropriate amount of punitive damages between $100 and $5,000 per violation pursuant to Civil Code Section 1785.31. The plaintiffs intend to file motions for fees and costs.

© 2014 The Daily Journal Corporation. All rights reserved.

---

**Questions and Comments**

| NEWS | RULINGS | VERDICTS |
| --- | --- | --- |

This week's cases                                     **Submit verdict**

**Animals**
**Code Violation**
$155,684,827 USDC Central

**Attorneys**
**Attorneys Fees**
$7,800,000 L.A. Superior Santa Monica

**Civil Rights**
**Deprivation of Rights**
Defense USDC Utah

**False Arrest**
Dismissal in part USDC Northern

**Constitutional Law**
**First Amendment**
Permanent Injunction USDC Southern

**First Amendment**
Plaintiff USDC Central

**Construction**
**Construction Defects**
$1,901,954 San Diego Superior

**Consumer Law**
**False Advertising**
$5,300,000 USDC Southern

**Advertising**
Dismissal USDC Central

**Advertising**
TRO Granted USDC Central

**Consumers Legal Remedies Act**
up to $8,250,000 USDC Northern

**Contracts**
**Breach of Contract**
$680,000 USDC Northern

**Interference with Contract**
Defense USDC Central

**Breach of Contract**
Preliminary Injunction Granted U.S. Court of Federal Claims

**Employment Law**
**Disability Discrimination**
$1,178,341 L.A. Superior

**ADA**
Defense L.A. Superior Central

**Retaliation**
Defense L.A. Superior Central

**Sexual Harassment**
Injunctive Relief California Department of Fair Employment and Housing

**Environmental Law**
**National Environmental Policy Act**
Defense USDC Northern

**Environmental Protection**
Dismissal USDC Washington, DC

**CEQA**
Preliminary Injunction Granted in part Sacramento Superior

**Health Care**
**Coverage Denied**
Dismissal USDC Northern

# Daily Journal

Classifieds/Jobs/Office Space  :  Experts/Services  :  MCLE  :  Search  :

THURSDAY     FRIDAY     MONDAY     TUESDAY     TODAY

Questi

VERDICTS & SETTLEMENTS

NEWS     RULINGS

Search >>
Bookmark

This week's cases

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

Animals
**Code Violation**
$155,684,827 USDC Central

| Intentional Infliction of | V | $177,000 | For the plaintiff: | L.A. Superior Central |
| Emotional Distress | | | David C. Smith | Hon. Emilie H. Elias |
| | | | John P. Swenson | |
| | | | For the defendant: | |
| | | | John Clark Brown, Jr. | |

Attorneys
**Attorneys Fees**
$7,800,000 L.A. Superior San

RESULT DATE: 'Sept. ' 30, 2003

Civil Rights
**Deprivation of Rights**
Defense USDC Utah

Castillo v. Americash, et al. (BC279021) 03-JV_1423

**False Arrest**
Dismissal in part USDC North

FURTHER DESCRIPTION: Debt Collection

VERDICT: $177,000

Constitutional Law
**First Amendment**
Permanent Injunction USDC !

ATTORNEY Plaintiff - David C. Smith, John P. Swenson (McNamara, Spira & Smith, Los Angeles). Defendant - John Clark Brown, Jr. (Offices of John Clark Brown, Jr., Inglewood).

**First Amendment**
Plaintiff USDC Central

FACTS: In June 2001, the plaintiffs entered into a home mortgage loan with the defendants. Almost immediately after they had entered into the loan agreement, the plaintiffs were advised by the defendant that their loan had been sold to Equicredit. The plaintiffs were given a new address to which to send their monthly mortgage payments, and they began making monthly payments to Equicredit commencing on Sep. 1, 2001. At all times, the plaintiff made timely, monthly payments pursuant to their Loan Agreement. On Jan. 31, 2002, the plaintiffs mailed their mortgage payment to Equicredit. This payment was mailed to Equicredit at the same address to which the plaintiffs had made their prior monthly payments as directed by Equicredit. Equicredit received and cashed the plaintiffs' check on Feb. 14, 2002. On Feb. 25, the plaintiffs were contacted by Equicredit and were advised that Equicredit had not received their February 2002 mortgage payment. The plaintiffs immediately contacted their bank and received confirmation that their check had been cashed. On March 6, the plaintiffs provided Equicredit with a copy of the cancelled check as proof that their February 2002 payment was timely received by Equicredit. Despite this, Equicredit refused to credit the plaintiffs' February 2002 payment and refused to acknowledge they had timely received the plaintiffs' payment for February. Instead, Equicredit started a collection campaign. Equicredit's collection attempts included letters to the plaintiffs threatening foreclosure and at least six telephone calls. Fairbanks officially took over the servicing of the plaintiffs' loan in April 2002. Fairbanks collection attempts included near daily telephone calls and multiple dunning letters. In late May 2002, the plaintiffs provided Fairbanks with a copy of the cancelled check as proof that their February 2002 payment had been timely made. Nonetheless, Fairbanks did not stop attempting to collect the payment until after the plaintiffs filed and served their complaint. In November 2002, the plaintiffs dismissed Americash as a defendant and proceeded against Equicredit and Fairbanks for violations of the California Fair Debt Collection Practices Act, intentional infliction of emotional distress and the negligent infliction of emotional distress.

Construction
**Construction Defects**
$1,901,954 San Diego Superio

Consumer Law
**False Advertising**
$5,300,000 USDC Southern

**Advertising**
Dismissal USDC Central

**Advertising**
TRO Granted USDC Central

CONTENTIONS: The plaintiffs alleged that the defendants debt collection attempts violated the California Fair Debt Collection Practices Act and caused the plaintiffs severe emotional distress. The jury found that Fairbanks violated the California Fair Debt Collection Act and also found liability under the theories of negligent and intentional infliction of emotional distress. The defendants, at trial, did not dispute that they had received the plaintiffs' February mortgage payment but claimed that the payment had not been properly posted to the plaintiffs' account due to an error made by the defendants' lockbox vendor (a third party vendor responsible for receiving and processing mortgage payments). The defendants further contended that Fairbanks had taken over the servicing of the plaintiffs' mortgage loan as of January, 2002, but waited to inform their customers of this arrangement until the transition was complete, on or about April 1, 2002. Finally, the defendants contended that while the attempts to collect the plaintiffs' mortgage payment were in error, their actions were privileged by virtue of being a good faith assertion of an economic interest.

**Consumers Legal Remedi**
up to $8,250,000 USDC Nort!

Contracts
**Breach of Contract**
$680,000 USDC Northern

**Interference with Contrac**
Defense USDC Central

**Breach of Contract**
Preliminary Injunction Grante
Federal Claims

DAMAGES: Emotional distress.

Employment Law
**Disability Discrimination**
$1,178,341 L.A. Superior

JURY TRIAL: Length, 3.5 days; Poll, 9-3; Deliberation, 2.5 days

**ADA**
Defense L.A. Superior Central

SETTLEMENT DISCUSSIONS: The plaintiffs demanded $150,000; the defendants offered $30,000. At a prior arbitration, the plaintiffs had demanded $200,000 and the defendants had offered $30,000.

**Retaliation**
Defense L.A. Superior Central

OTHER INFORMATION: The plaintiffs have filed a motion for fees of $156,000 and costs of $21,000.

**Sexual Harassment**
Injunctive Relief California De
Employment and Housing

© 2014 The Daily Journal Corporation. All rights reserved.

# Daily Journal

Classifieds/Jobs/Office Space : Experts/Services : MCLE : Search : Logout

| THURSDAY | FRIDAY | MONDAY | TUESDAY | TODAY |
|---|---|---|---|---|

**VERDICTS & SETTLEMENTS**

Search >>
Bookmark

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

| Fraud | V | $151,976 | For the plaintiff:<br>David A. Demanski<br>Kim L. Ellis<br>For the defendant:<br>James R. Rogers<br>Jason Sparta | San Diego Superior<br>Hon. Lillian Y. Lim |
|---|---|---|---|---|

RESULT DATE: July 16, 2007

Michael Pickering v. Coast Surgery Center (GIC839999) 07-JV_1504

FURTHER DESCRIPTION: Fair Debt Collection Practices Act

VERDICT: $151,976

ATTORNEY Plaintiff - David A. Demanski, Kim L. Ellis (Demanski & Ellis, San Diego).
Defendant - James R. Rogers, Jason Sparta (Law Offices of James R. Rogers, Solana Beach).

FACTS: Coast Surgery Center informed Michael Pickering that it would accept payments through his Aetna health insurance policy for his surgery. The center had an agreement with Aetna to accept a contracted rate for surgical services rendered to Aetna insureds like Pickering. After Pickering's surgery, Pickering's attorney contacted the center to try and obtain medical documentation related to injuries Pickering had sustained in a car accident. Aetna paid a portion of Pickering's bill, and the center accepted the payment.

It then claimed a lien against Pickering's accident case. Pickering refused to sign a lien, and the center then hired Lake Valley Retrievals Inc. to collect the unpaid portion of the surgery bill. Pickering successfully defended the collection action, and Lake Valley was found to have violated the federal and state Fair Debt Collection Practices Act. Pickering then filed suit against the center.

CONTENTIONS: PLAINTIFF'S CONTENTIONS: Plaintiff contended that although the center was entitled to additional payments from Aetna pursuant to the agreement, it did not pursue its rights to appeal the underpayment. The plaintiff claimed that defendant had concealed its policy of billing patients with representation for a claim based on an accident for the balance of their surgery bills not covered by insurance. He argued that defendant was a debt collector under the facts of this case, and therefore was vicariously liable for the acts of its agent, Lake Valley.

DEFENDANT'S CONTENTIONS: The defendant claimed it did pursue its right to appeal but Aetna refused to pay; that Pickering failed to provide defendant any assistance in getting paid; and, it could not be vicariously liable for Lake Valley's violations of the Fair Debt Collection Practices Acts because it was a creditor, not a debt collector.

INJURIES: The plaintiff alleged that he suffered from emotional distress caused by the collection action because the collection action had caused his credit rating to decrease and interfered with his ability to borrow even small amounts of money.

DAMAGES: The plaintiff sought to recover his attorney fees incurred in defending the collection action for approximately one year.

JURY TRIAL: Length, eight days;

SETTLEMENT DISCUSSIONS: The defendant offered $7,500 to settle.

RESULT: A jury found that defendant was a debt collector under both the federal and state act. It awarded plaintiff $151,976, consisting of $16,885 for past economic loss, including attorney fees incurred in the collection action, $100,000 for past and future non-economic loss, and $35,091 in punitive damages, representing the amount claimed by defendant in the underlying collection action.

Defendant Coast was awarded a judgment against the debt collector, Lake Valley, for the full amount of plaintiff's judgment, plus its attorneys fees.

OTHER INFORMATION: Defendant Coast has appealed the judgment.

© 2014 The Daily Journal Corporation. All rights reserved.



Experience & Results

## This week's cases

| NEWS | RULINGS | VERDICTS |
|---|---|---|

Questions and Comments

Submit verdict

**Animals**
Code Violation
$155,684,827 USDC Central

**Attorneys**
Attorneys Fees
$7,800,000 L.A. Superior Santa Monica

**Civil Rights**
Deprivation of Rights
Defense USDC Utah

**False Arrest**
Dismissal in part USDC Northern

**Constitutional Law**
First Amendment
Permanent Injunction USDC Southern

**First Amendment**
Plaintiff USDC Central

**Construction**
Construction Defects
$1,901,954 San Diego Superior

**Consumer Law**
False Advertising
$5,300,000 USDC Southern

**Advertising**
Dismissal USDC Central

**Advertising**
TRO Granted USDC Central

**Consumers Legal Remedies Act**
up to $8,250,000 USDC Northern

**Contracts**
Breach of Contract
$680,000 USDC Northern

**Interference with Contract**
Defense USDC Central

**Breach of Contract**
Preliminary Injunction Granted U.S. Court of Federal Claims

**Employment Law**
Disability Discrimination
$1,178,341 L.A. Superior

**ADA**
Defense L.A. Superior Central

**Retaliation**
Defense L.A. Superior Central

**Sexual Harassment**
Injunctive Relief California Department of Fair Employment and Housing

**Environmental Law**
National Environmental Policy Act
Defense USDC Northern

**Environmental Protection**
Dismissal USDC Washington, DC

**CEQA**
Preliminary Injunction Granted in part
Sacramento Superior

**Health Care**
Coverage Denied
Dismissal USDC Northern

**Coverage**
Preliminary Injunction Granted USDC Texas

**Insurance**

Daily Journal - California's Largest Legal News Provider                                    Page 1 of 3

# Daily Journal

**Classifieds/Jobs/Office Space : Experts/Services : MCLE**

| THURSDAY | FRIDAY | MONDAY | TUESDAY | TODAY |
|----------|--------|--------|---------|-------|

### VERDICTS & SETTLEMENTS

NEWS    F

Search >>

Bookmark

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

This week's case

Animals
**Code Violatio**
$155,684,827 U

Attorneys
**Attorneys Fee**
$7,800,000 L.A

Civil Rights
**Deprivation o**
Defense USDC I

| Loan Agreement | V | $500,000 | | For the plaintiff: | USDC Northern |
|---|---|---|---|---|---|
| | | | | David Humphreys | Hon. James W. Ware |
| | | | | Luke Wallace | |
| | | | | Balam O. Letona | |
| | | | | Ronald Wilcox | |
| | | | | For the defendant: | |
| | | | | Tomio B. Narita | |
| | | | | Jeffrey A. Topor | |
| | | | | John F. Gillespie | |
| | | | | Jeff Lucas | |

**False Arrest**
Dismissal in par

Constitutional I
**First Amendn**
Permanent Inju

**RESULT DATE:** April 21, 2009

Manuel Fausto, Luz Fausto v. Credigy Services Corporation, et al. (5:07-cv-05658-JW) 09-JV_897

**FURTHER DESCRIPTION:** Fair Debt Collection Practices Act

**VERDICT:** $500,000

**First Amendn**
Plaintiff USDC (

**ATTORNEY** Plaintiff - David Humphreys, Luke Wallace (Humphreys, Wallace & Humphreys, PC, Tulsa, Okla.); Balam O. Letona (Law Offices of Balam O. Letona, Santa Cruz); Ronald Wilcox (Law Offices of Ronald Wilcox, San Jose).
Defendant - Tomio B. Narita, Jeffrey A. Topor (Simmonds & Narita, San Francisco); John F. Gillespie, Jeff Lucas (Stewart & Associates, Suwanee, Ga.).

Construction
**Construction**
$1,901,954 San

**FACTS:** Manuel Fausto opened a Wells Fargo charge card in 1992. The card had a credit limit of $1000. Mr. Fausto and his wife, Luz Fausto, made monthly payments, but the balance continually increased, and the Faustos sought assistance from a local loan modification business. In 1998 or 1999, the Wells Fargo debt was paid off.

Consumer Law
**False Advertis**
$5,300,000 US

In August 2006, Credigy Services Corp. (Credigy) contacted the Faustos at their home by phone and by mail regarding their debt. The Faustos did not recognize Credigy as a party they had dealt with previously regarding the Wells Fargo debt. Credigy claimed that they had assumed the debt and that the Faustos owed them $17,000.

**Advertising**
Dismissal USDC

With the assistance of the Watsonville Law Center, a non-profit legal clinic, the Faustos sent Credigy a letter demanding proof of the debt. Credigy did not provide proof and the Faustos sent a cease and desist letter demanding that no further contact be made by Credigy. Credigy continued to call and send letters. The Faustos sued Credigy claiming violations of the federal and state Fair Debt Collection Practices Act.

**Advertising**
TRO Granted U

**Consumers L**
up to $8,250,00

**CONTENTIONS: PLAINTIFFS' CONTENTIONS:** Plaintiffs contended that Credigy made repeated false threats and claims regarding the debt. These included a false threat that Credigy would take plaintiffs' home and paycheck, a false claim that Mrs. Fausto was jointly liable for the debt, and a false claim that Credigy would report the account "forever" on Mr. Fausto's credit file.

Contracts
**Breach of Cor**
$680,000 USD(

**DEFENDANTS' CONTENTIONS:** Credigy contended that it had made a "bona fide error" in continuing its collection efforts against the Faustos. The dispute resolution team was overloaded with work and lacked the resources to spot the error that had occurred in the Faustos file.

**Interference v**
Defense USDC (

**Breach of Cor**
Preliminary Inju
Federal Claims

**RESULT:** Plaintiffs' verdict for $500,000. The award consisted of $100,000 in actual damages and $400,000 in punitive damages. Plaintiffs are also entitled to attorney fees and costs.

Employment La
**Disability Dis**
$1,178,341 L.A.

© 2014 The Daily Journal Corporation.  All rights reserved.

**ADA**
Defense L.A. Su

Daily Journal - California's Largest Legal News Provider                                    Page 1 of 3

---

**Daily Journal**   Classifieds/Jobs/Office Space : Experts/Services : MCLE

---

| THURSDAY | FRIDAY | MONDAY | TUESDAY | TODAY |

VERDICTS & SETTLEMENTS                                    NEWS      F

Search >>
Bookmark

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

This week's cas

Animals
**Code Violatio**
$155,684,827 U

Attorneys
**Attorneys Fee**
$7,800,000 L.A

| Intentional Infliction of | V | $340,810 | For the plaintiff: | San Francisco Superior |
Emotional Distress

For the plaintiff:
Anne Marie Murphy      Hon. Ernest H.
Justin Berger          Goldsmith
Niall P. McCarthy
For the defendant:
Andrew M. Steinheimer

Civil Rights
**Deprivation o**
Defense USDC l

**RESULT DATE:** Jan. 2, 2008

**False Arrest**
Dismissal in pa

Anastasiya Komarova v. MBNA America Bank N.A., FIA Card Services N.A., National Credit Acceptance Inc.
(CGC-06-456891) 08-JV_190

Constitutional I

**FURTHER DESCRIPTION:** Fair Debt Collection Practices Act

**First Amendn**
Permanent Inju

**VERDICT:** $340,810

**ATTORNEY** Plaintiff - Anne Marie Murphy, Justin Berger, Niall P. McCarthy (Cotchett, Pitre & McCarthy,
Burlingame).
Defendant - Andrew M. Steinheimer (Ellis, Coleman, Poirier, LaVoie & Steinheimer, LLP, Sacramento).

**First Amendn**
Plaintiff USDC (

**TECHNICAL**
Defendant - Ronald Sargis, creditor negligence/abuse, Sacramento.

Construction
**Construction**
$1,901,954 San

**FACTS:** Plaintiff Anastasiya Komarova, a 30-year-old artist, was hounded from February 2005 to February
2006 by defendant National Credit Acceptance Inc. (NCA) for a credit card debt she never incurred. NCA
called plaintiff at work about a debt with MBNA, although she never had a credit card from the bank. NCA
nevertheless continued to pursue collection and obtained a default arbitration award against her without
notice. Plaintiff sued defendants for intentional infliction of emotional distress and violation of the California
Fair Debt Collection Practices Act. Defendants MBNA and FIA were dismissed before trial. Discovery
revealed they had no interest in the alleged debt and were not responsible for targeting plaintiff.

Consumer Law
**False Advertis**
$5,300,000 US.

**Advertising**
Dismissal USD(

**CONTENTIONS: PLAINTIFF'S CONTENTIONS:** The plaintiff contended she incurred out-of-pocket expenses
as a result of defendant's collection efforts, including attorney fees to fight confirmation of the arbitration
award; non-refundable classes; mailing charges; and missed work. The plaintiff also suffered emotional
distress from the experience.

**Advertising**
TRO Granted U

**Consumers L**
up to $8,250,0C

DEFENDANT'S CONTENTIONS: The defendant contended it was immune from liability under the bona
fide error defense. The authorized user on the credit card was spelled similarly and caused defendant's
mistake. Further, defendant argued plaintiff's claims were barred by either the statute of limitations or
litigation privilege. However, the judge rejected the defense and the appellate court summarily denied
defendant's writ petition.

Contracts
**Breach of Cor**
$680,000 USD(

**Interference \**
Defense USDC (

**INJURIES:** The plaintiff suffered emotional distress.

**Breach of Cor**
Preliminary Inju
Federal Claims

**DAMAGES:** The plaintiff sought damages for out-of-pocket expenses incurred in fighting defendant's claim, as
well as punitive damages and attorney fees.

Employment La
**Disability Dis**
$1,178,341 L.A.

**RESULT:** The court awarded plaintiff $340,810.

**ADA**
Defense L.A. Su

© 2014 The Daily Journal Corporation.  All rights reserved.

Daily Journal - California's Largest Legal News Provider                                Page 1 of 3

# 𝕯𝕬𝕴𝕷𝕐 𝕵𝕺𝕌𝕽𝕹𝕬𝕷   Classifieds/Jobs/Office Space  :  Experts/Services

**WEDNESDAY    THURSDAY    FRIDAY    MONDAY    TODAY**                           NE

### VERDICTS & SETTLEMENTS

This

Search >>                                                                        Anin
Bookmark                                                                         **Cod**
                                                                                 $155

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, modified, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in commercial marketing materials or for permission to post on a website.

Atto:
**Atto**
Intentional Interference   V   $765,000          For the plaintiff:          San Bernardino Superior          **$7,8**
with Economic                                    Robert F. Brennan           Hon. Martin A. Hildreth
Advantage                                        For the defendant:                                           Civil
                                                 Richard J. Decker                                            **Dep**
RESULT DATE: March 6, 2007                       Lawrence Yang                                                Defe

Reed Fisher and Mary Anne Fisher v. Wells Fargo Home Mortgage (RCV 074 822) 07-JV_300          **Fals**
                                                                                                Disn
FURTHER DESCRIPTION: Defamation/Negligence
                                                                                                Cons
VERDICT: $765,000                                                                               **Firs**
                                                                                                Pern
ATTORNEY Plaintiff - Robert F. Brennan (Brennan, Wiener & Associates, La Cresenta).
   Defendant - Richard J. Decker, Lawrence Yang (Stephan, Oringher, Richman, Theodora & Miller, Los          **Firs**
   Angeles).                                                                                                  Plain

TECHNICAL Plaintiff - Thomas A. Tarter, .                                                                     Cons
                                                                                                             **Con**
FACTS: ACCORDING TO THE PLAINTIFF: In 2001, plaintiffs Reed and MaryAnne Fisher, who live in San            $1,9
   Clemente, had their home red-tagged due to land instability. The plaintiffs contacted defendant Wells Fargo
   Home Mortgage, their mortgage service, and obtained a forbearance agreement so that they would not be      Cons
   required to make mortgage payments while the house was red-tagged.                                        **Fals**
                                                                                                            $5,3
   The defendant eventually transferred the mortgage to Freddie Mac, the mortgage holder. Mac charged off
   the loan with a zero balance. There were also no negative credit marks, as plaintiffs had always promptly **Adv**
   made their mortgage payments.                                                                              Disn

   However, the defendant submitted false negative credit information to the credit bureaus, alleging that    **Adv**
   plaintiffs were between 30 and 90 days late on their mortgage payments. The defendant also improperly       TRO
   instituted foreclosure proceedings on the house. As a result, the plaintiffs had difficulty finding another
   place to reside and encountered other problems over the span of two years. Although defendant would        **Con**
   notify plaintiffs in writing that it was correcting the erroneous reports, it continued to provide false    up to
   credit information to the credit bureaus. This conduct damaged plaintiffs' credit scores.
                                                                                                              Cont
   ACCORDING TO THE DEFENDANT: Plaintiffs Reed and Maryann Fisher owned a home in San                        **Bre**
   Clemente. In March 2001, the City of San Clemente determined that the Fishers' property was unsafe and     $680
   uninhabitable due to land substance. The Fishers subsequently contacted Wells Fargo Home Mortgage,
   the services of their mortgage to obtain a Forbearance Agreement so they would not have to make their      **Inte**
   mortgage payments for the months of April, May and June 2001. Despite not signing a written Forbearance    Defe
   Agreement, Wells Fargo Home Mortgage gave them the requested forbearance.
                                                                                                              **Bre**
   Nevertheless, the owner of the loan, GE Capital, mistakenly reported to the credit reporting agencies that Preli
   the Fishers were 30/60/90 days late on their mortgage payments, which resulted in derogatory information   Fede
   appearing on their credit reports. The Fishers learned of this in May 2001 and notified Wells Fargo Home
   Mortgage of the problem on May 23, 2001. Wells Fargo Home Mortgage took responsibility, immediately
   investigated and reported corrected information to the credit reporting agencies on June 8, 2001. The three
   credit reporting agencies, Equifax, Experian and TransUnion all corrected Maryann Fisher's credit report.
   However, only Equifax and Experian corrected Reed Fisher's credit report. The Fishers ultimately obtained
   a loan from Countrywide in Maryann Fisher's name in connection with their purchase of a residence in

Utah, which occurred in the September/October 2001 time period. Wells Fargo Home Mortgage was unaware of any further problems with Reed Fisher's credit report until May 2003. Upon being notified in May 2003 that the problem with Reed Fisher's credit report still persisted, Wells Fargo again timely instructed TransUnion (as well as the other credit reporting agencies as a matter of precaution) to correct the Fisher's credit report and remove the negative information. That occurred in August 2003.

The Fishers sued both Wells Fargo and TransUnion for violation of the Fair Credit Reporting Act and the California Consumer Credit Reporting Agencies Act, and Wells Fargo for intentional interference with prospective economic advantage, defamation and negligence. Before trial, TransUnion settled for a confidential amount. The Fishers claimed, among other things, that Wells Fargo failed to correct the Fishers' credit rating for two years despite receiving numerous complaints from the Fishers; that Wells Fargo's internal policies and procedures made it impossible to resolve the Fisher's credit problem in a timely fashion, and they were deprived of their right to have accurate timely credit reports. Wells Fargo disputed the Fishers' allegations, contending that it took immediate and decisive action in accordance with the applicable law to remedy the problem once it received notice of the problem. The Fishers, at trial, dismissed all of their claims against Wells Fargo except for its claims for violation of the Federal Fair Credit Reporting Act and the California Consumer Credit Reporting Agencies Act.

**CONTENTIONS: PLAINTIFFS' CONTENTIONS:** The plaintiffs contended that the defendant's conduct dviolated the federal Fair Credit Reporting Act and the California Consumer Credit Reporting Agencies Act.

**DEFENDANT'S CONTENTIONS:** The defendant contended that they did not violate the acts. Further, plaintiffs did not incur actual damages.

**DAMAGES:** The Fishers claimed out-of-pocket damages for approximately $20,000. They also sought emotional distress and punitive damages. Wells Fargo contended that the Fishers suffered no damage as a result of Wells Fargo's conduct.

**JURY TRIAL:** Length, seven days; Poll, 12-0 (liability); 11-1 (actual damages); 9-3 (punitive damages); Deliberation, two days

**SETTLEMENT DISCUSSIONS:** The Fishers demanded $200,000 plus attorney fees; the defendant offered $40,000.

**RESULT:** The plaintiffs were awarded $15,000 in actual damages; $750,000 in punitive damages on the Federal Fair Credit Reporting Act claim and $120,000 in punitive damages on the California Consumer Credit Reporting Agencies Act claim.

© 2014 The Daily Journal Corporation. All rights reserved.



## 𝔇aily 𝔍ournal          Classifieds/Jobs/Office Space  :  Experts/Services

| WEDNESDAY | THURSDAY | FRIDAY | MONDAY | TODAY |
|---|---|---|---|---|

### VERDICTS & SETTLEMENTS                                                NE

Search >>
Bookmark

This is the property of the Daily Journal Corporation and fully protected by copyright. It is made available only to Daily Journal subscribers for personal or collaborative purposes and may not be distributed, reproduced, stored or transferred without written permission. Please click "Reprint" to order presentation-ready copies to distribute to clients or use in internal marketing materials or for permission to post on a website.

| Fraud | B | $9,458,000 | For the plaintiff:<br>John C. Torjesen | L.A. Superior Central<br>Hon. Soussan G.<br>Bruguera |
|---|---|---|---|---|

**RESULT DATE:** Aug. 2, 2007

Isaac Martin v. Itchak Brill, Private Investor Financing, Yair Hapraz, Annette Renee McCullough (BC217022) 07-JV_1057

**FURTHER DESCRIPTION:** Wrongful Foreclosure

**BENCH DECISION:** $9,458,000

**ATTORNEY Plaintiff** - John C. Torjesen (John C. Torjesen & Associates, PC, Los Angeles).

**TECHNICAL Plaintiff** - Samuel K. Freshman, real estate finance issues, Los Angeles; Rodney Gresko, property appraisal, Santa Clarita.

**FACTS:** Plaintiff Isaac Martin was building a home on a hill in Placerita Canyon and obtained additional construction financing with a loan for $175,000 from defendants that was secured by a third deed of trust on the property.

The third loan was in the name of Itchak Brill as the lender, and was arranged by his brother-in-law Yair Harpaz who was operating a mortgage brokerage business called Private Investors Financing under the license of Annette McCullough.

With the house almost complete, and appraised at approximately $1 million, the defendants foreclosed on the house with plaintiff complaining to defendants that they had not fully funded the loan.

Plaintiff's lawsuit was filed after foreclosure alleging wrongful foreclosure, fraud, etc. The court ordered informal exchange of information to determine if or to what extent the loan was funded and how it was serviced.

The defendants responded with a Quicken register claiming they of the $175,000 loan amount, they had disbursed more than $83,000 in cash payments to fund the loan, with the remainder of the funds being paid with checks. The alleged cash payments were purportedly made in various increments of $5,000, $10,000, etc.

**CONTENTIONS: PLAINTIFF'S CONTENTIONS:** The plaintiff argued that it was contrary to custom and practice in the industry to make cash payments to fund a construction loan. The plaintiff contended that there was no record of the alleged cash payments being withdrawn or transferred from any bank of financial institution. The plaintiff also argued that the defendants were underfunding the loan as a way to obtain secret profits on the loan, and that these secret profits were designed to avoid taxes by taking profits secretly as return of capital.

The plaintiff further argued that an assignment by defendants of a portion of the loan to another investor, guaranteeing a higher rate of return than the stated interest rate to plaintiff, confirmed that the defendants were taking secret profits, because those additional profits would be needed to fund that higher rate of return that was guaranteed to the assignee.

The plaintiff also argued that there was no crossover between the plaintiff and the defendants with respect to their ethnic or cultural backgrounds, families, communities, friends, or otherwise, that might support informal cash transfers between them.

The plaintiff claimed that the defendants were also working in cahoots with the lenders on the first and second note who were in the same office as defendants, to take the property under a "loan to own" scheme because of its value. Plaintiff had several brokers try to obtain a payoff prior to foreclosure so he could refinance, but defendants would refuse to commit to any sum which prevented plaintiff from refinancing.

DEFENDANT'S CONTENTIONS: The defendant countered by claiming that the plaintiff had grabbed the receipts for the cash payments when he was in their office. The defendants also claimed they had cash available because Itchak Brill had a vending route selling nuts and had those sums of money in cash at his house accumulated from the coins deposited into the vending machines.

The defendants also contended that there was no equity in the house being built by plaintiff so there could be no harm to plaintiff. Defendants claimed that plaintiff was a sophisticated borrower who used about nine loan brokers over the history of his ownership of the property. Defendants claimed he understood everything yet simply could not afford the deal.

RESULT: $9,458,000 ($958,000 economic; $150,000 non-economic; $8,350,000 punitive).

OTHER INFORMATION: According to plaintiff's counsel, the defendants' original attorney withdrew after the disclosure that the defendants were claiming to have made cash payments of more than $83,000. Defendants' attorneys dispute this.

According to plaintiff's counsel, a new attorney then appeared for the defendants, conducted discovery and obtained a summary judgment, that was reversed on appeal because it was a question of fact whether or not defendants had made the alleged cash payments. That second attorney for defendants then tried the first phase of the case which resulted in a finding of liability and an award of compensatory damages.

According to plaintiff's counsel, after the finding of liability and award of compensatory damages, the defendants obtained new counsel and filed five bankruptcy petitions seriatim that were each denied or dismissed.

According to defense counsel, the bankruptcies preceded this trial (the bankruptcy counsel is not any of the trial counsel) and some of the petitions are still pending. All trial counsel entered the case after the principal trial, and sought to correct many errors which the judge did not allow. The defense counsel plans to appeal if necessary. The bankruptcy court allowed this case to proceed to judgment but not to collection.

According to plaintiff's counsel, the fraudulent conveyance action is based on a high-value house overlooking the Calabasas Country Club where one defendant lives, that was originally titled in the name of another defendant, and that was transferred during trial - first to a family trust and then to a niece's corporation as its sole asset.

The fraudulent conveyance action is pending in the bankruptcy court. Defendants now claim in that action that plaintiff should be limited to the value of the house at the time of its fraudulent transfer rather than its current appreciated value.

Defense counsel notes that the judge interjected personal comments in the beginning of the "findings of fact." Plaintiff counsel noted that this judge ruled against plaintiffs on the summary judgment that was reversed, and then struck plaintiff's jury demand at the time of trial, but once she heard the evidence, disbelieved defendants' story.

Plaintiff's counsel further claims that the record has overwhelming evidence of repeated fraud and lies by defendant hard money lenders, and that plaintiffs' economic damages are supported by three different methods of assessing loss. Plaintiff denies there was any error in the two trials.

The minute order from Aug. 2, 2007 announced a decision about punitive damages and directed the plaintiff to submit a proposed order. No judgment yet has been entered.

Defendants plan to appeal.

**EXHIBIT  D**

*17278532*

Loan Number 03120294

## InterestFirst℠ NOTE

JANUARY 8, 2004                    ENCINO          CALIFORNIA
[Date]                             [City]          [State]

7259 HYANNIS DRIVE, (WEST HILLS AREA) LOS ANGELES, CALIFORNIA 91307
[Property Address]

*17278532*

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 444,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  SKYLINE FINANCIAL CORP., DBA SKYLINE FUNDING, A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.500      %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) **Time and Place of Payments**

I will make a payment every month. This payment will be for interest only for the first 120 months, and then will consist of principal and interest.

I will make my monthly payment on the  1st day of each month beginning on    MARCH  1 , 2004 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on FEBRUARY  1      , 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   15928 VENTURA BOULEVARD, SUITE 110, ENCINO, CALIFORNIA 91436-4401

or at a different place if required by the Note Holder.

(B) **Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 2,405.00     for the first 120  months of this Note, and thereafter will be in the amount of U.S. $ 3,310.34      . The Note Holder will notify me prior to the date of change in monthly payment.

### 4. BORROWER'S RIGHT TO PREPAY     ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

---

13s3271l.uol

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may

---

Us3271z.not

be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

        If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

        If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
VICTOR  LONDON         -Borrower

_____ (Seal)
RITA  C.  LONDON     -Borrower

_____ (Seal)
            -Borrower

_____ (Seal)
            -Borrower

_____ (Seal)
            -Borrower

_____ (Seal)
            -Borrower

[Sign Original Only]

MULTISTATE InterestFirst FIXED RATE NOTE--Single Family
Fannie Mae UNIFORM INSTRUMENT
Form 3271 1/01                  Page 3 of 3

DocMagic eForms  800-649-1362
www.docmagic.com

US3271S.nrk

Loan Number 03120294

# PREPAYMENT NOTE ADDENDUM
## (Multi-State)

This Prepayment Note Addendum is made this    8th day of JANUARY, 2004              and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to SKYLINE FINANCIAL CORP., DBA SKYLINE FUNDING, A CALIFORNIA CORPORATION                      (the "Lender"), which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at 7259 HYANNIS DRIVE, (WEST HILLS AREA) LOS ANGELES, CALIFORNIA 91307                                                  (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant, and agree that, the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" are amended to read as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

**If, within the   60    month(s) period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, I will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the Prepayment, unless otherwise prohibited by applicable law or regulation. No Prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first   0    month(s) of the term of the Note, no Prepayment penalty will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a Partial Prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If my Note is an Adjustable Rate Note, Partial Prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the Partial Prepayment. However, any reduction due to my Partial Prepayment may be offset by an interest rate increase.

MULTI-STATE PREPAYMENT NOTE ADDENDUM
FORM 603B1 1-01                              Page 1 of 2                    DocMagic *eForms* 800-649-1362
                                                                           www.docmagic.com

US603B11.aff

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

## NOTICE TO BORROWER

Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

_____ (Seal)
VICTOR LONDON                -Borrower

_____ (Seal)
RITA G. LONDON               -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

MULTI-STATE PREPAYMENT NOTE ADDENDUM
FORM 60381 1-01                    Page 2 of 2

DocMagic *eForms* 800-649-1362
www.docmagic.com

Usec03b12.als

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY:

RICK W. SKOGG
VICE PRESIDENT

Pay To The Order Of

LEHMAN BROTHERS BANK, FSB

without recourse, by
Skyline Financial Corp., DBA SKYLINE FUNDING,
A CALIFORNIA CORPORATION

ESPY AVALOS, FUNDER

PAY TO THE ORDER OF

WITHOUT RECOURSE
LEHMAN BROTHERS, HOLDINGS, INC.

BY:

RALPH A. LUND III
AUTHORIZED SIGNATORY